**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Patricia A. Dodson,** <br><br> **Plaintiff,** <br><br>      **v.** <br><br> **Coatesville Hospital Corporation d/b/a Brandywine Hospital,** <br><br> **Defendant.** | **CIVIL ACTION** <br><br> **NO. 16-5857** |

<u>**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**</u>

**Baylson, J.**                                                         **August  21  , 2018**

## I.     Introduction

Plaintiff Patricia Dodson was terminated from her job at Defendant Coatesville Hospital Corporation d/b/a Brandywine Hospital in November 2011 when her position as Director of Physician Practice Management was eliminated. She subsequently filed suit, alleging six counts of discrimination under state and federal law:

I)       Associational Disability Discrimination in Violation of the Americans with Disabilities Act (ADA)

II)      Associational Disability Discrimination in Violation of the Pennsylvania Human Relations Act (PHRA)

III)     Discrimination in Violation of the Age Discrimination in Employment Act

IV)     Age Discrimination in Violation of the PHRA

V)       Retaliation under the ADA

VI)     Retaliation under the PHRA

(Second Am. Compl., ECF 7).

The Hospital now moves for summary judgment on the associational disability discrimination claims under the ADA and PHRA (Counts I and II), the only counts remaining, which this Court hereby **GRANTS**.

## II.     Background

Plaintiff Patricia Dodson was hired as Director of Physician Practice Management at Defendant Coatesville Hospital Corporation (Defendant or "the Hospital") on May 10, 2010. (Def.'s SOF ¶ 1, ECF 42; Pl.'s SOF ¶ 1, ECF 43).   As Director of Physician Practice Management, she was responsible for overseeing the management and finances of physician practices owned by the Hospital, and for recruiting both new physicians to join existing Hospital-owned practices and new practices to join the Hospital's network.  (Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2).  She reported to the then-CEO of the Hospital, Bryan Burklow.  (Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4).

Plaintiff's husband was diagnosed with colon rectal cancer in July 2010, and Plaintiff informed Burklow of her husband's diagnosis that month.  (Def.'s SOF ¶ 6-7; Pl.'s SOF ¶ 6-7). Plaintiff took off a week in January 2011 to care for her husband after his surgery, but otherwise did not request or take off any time due to her husband's illness.  (Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14).  Plaintiff never took FMLA leave to care for her husband, but Burklow expressed concern about the expense of other employees taking FMLA leave, and, according to Plaintiff, remarked that one such employee was using the Hospital as a "country club."  (Dodson Dep. 272:18-273:10, Ex. A to Def.'s SOF, ECF 42-1).

Burklow would frequently ask about Plaintiff's husband's medical status, and treatment plans, and next steps, which Plaintiff found "intrusive."  (Id. 222:12).  Plaintiff testified to an "intense amount of focus" on her husband's medical issues "almost every time" she spoke with Burklow, but did not perceive Burklow as expressing concern, as he would frequently be turned

toward his computer while asking about Plaintiff's husband.  (<u>Id.</u> 212:21-22; 220:2-6).  However, she did not ask him to stop asking about her husband, because she was "not that rude." (<u>Id.</u> 217:2-3).  Burklow repeatedly shared the story with Plaintiff of how his daughter had been treated for brain cancer, and, according to Plaintiff's testimony, would state how "disruptive" dealing with cancer could be to a family, and how it could "take[] a toll" on professional life. (<u>Id.</u> 221:21-23).  There is no evidence that Burklow ever discussed with Plaintiff whether she and her family were receiving health insurance through the Hospital, or whether Plaintiff's husband received care at the Hospital, although Hospital employees were encouraged to receive their medical care at the Hospital, which waived co-pays and deductibles for employees.  (Def.'s SOF ¶ 21, 70; Pl.'s SOF ¶ 21, 70).

In December 2010 or January 2011, Plaintiff and Burklow met with Dr. Leo Robb, a physician who admittedly did not like Plaintiff, to discuss financial and managerial issues in Dr. Robb's practice.  (Def.'s SOF ¶ 24; Pl.'s SOF ¶ 24).  Plaintiff testified that Burklow subsequently told Dr. Robb, as an "excuse," that Plaintiff was "distracted by [her] husband's illness."  (Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25).  At his deposition, Burklow testified that he did not recall making this comment.  (Burklow Dep. 118:19-23).

In the months that followed, Plaintiff's relationship with Burklow evidently deteriorated. During this time, Burklow continued asking Plaintiff about her husband's health "every time [they] met," but she declined to request that they not discuss the issue because the relationship had "deteriorated."  (Pl. Dep. 229:22-230:15).  When asked why the relationship had deteriorated, Plaintiff testified that "[t]he relationship deteriorated because he was not providing me the backing I needed from my leader for many of the issues that should have been easily

taken care of and...weren't," and because he discussed Plaintiff's job performance with colleagues. (Id. 230:19-24).

Both Plaintiff and Burklow testified that in summer 2011, Defendant was losing money; Plaintiff admitted that her department was losing money, and "the whole health system lost money consistently." (Pl. Dep. 167:23-168:2; 169:6-10). Burklow testified that because the physician practices were losing money, he was considering not adding new practices and not expanding existing practices. (Burklow Dep. 60:14-61:1). However, Plaintiff submitted a declaration that the intention not to add new practices or expand existing practices had not been communicated to her, and she continued to recruit new physicians through September 2011 and scout new locations through fall 2011. (Dodson Decl., Ex. R to Pl.'s SOF, 43-1).

On September 30, 2011, Plaintiff's son was seen in the emergency department for suicidal ideation. (Def.'s SOF ¶ 35; Pl.'s SOF ¶ 35). Plaintiff testified that although she instructed another employee not to tell Burklow that her son was seen in the emergency department, the following day, Burklow asked her how her son was doing, and again recounted his daughter's struggle with brain cancer. (Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36). At his deposition, Burklow testified that he did not remember becoming aware of any health problems experienced by Plaintiff's son requiring treatment at the Hospital. (Burklow Dep. 137:5-8).

In late October 2011, a management meeting was held, at which, Plaintiff testified, Burklow discussed the financial troubles faced by the hospital that quarter, "that the practice plan was...negatively affecting the financials." (Pl.'s Dep. 255:18-23). According to Plaintiff, Burklow also addressed health issues faced by the families of hospital leadership, and stated that "some of us in leadership who had experienced their -- had experienced either deaths in their family or significant illnesses in their families that were also impact -- having -- being impactful

and that it was probably as a result of our age." (Id. 255:24-256:6). Burklow, who recalled making the statement, described this as "a general statement…saying, you know…we're kind of all human, just a lot of bad luck things are happening to us as a group." (Burklow Dep. 134:3-13). At his deposition in December 2017, he testified that "[he] believe[d]" that the mother of the assistant head of nurses, Susan Lesch, had died. (Id.) In conjunction with this litigation, Plaintiff submitted a declaration from Lesch attesting that she had experienced no recent deaths in her family in 2011, and both her parents had been alive through the end of 2016. (Lesch Decl., Ex. V to Pl.'s SOF, ECF 43-1).

On or about November 4, 2011, Burklow informed Plaintiff, that the Hospital would be conducting a reduction in force, and asked Plaintiff to provide him with three or four positions within the physician practices that could be eliminated. (Def.'s SOF ¶¶ 44-45; Pl.'s SOF ¶¶ 44-45). Plaintiff provided Burklow with four names from the practices that could be eliminated. (Def.'s SOF ¶ 47; Pl.'s SOF ¶ 47).

Ultimately, Burklow decided to include Plaintiff in the layoffs, and on November 6, 2011, Plaintiff was terminated from her employment at Defendant. (Def.'s SOF ¶ 54; Pl.'s SOF ¶ 54). Seven other employees of Defendant were terminated that same day as part of the reduction in force. (Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3). At his deposition, Burklow testified that "we probably were going to be shrinking the practices" and decided that "we could live without [Plaintiff's] position." (Burklow Dep. 29:14-19).

Plaintiff's position was not replaced until at least 2016. (Def.'s SOF ¶ 5; Pl.'s SOF ¶ 5). Although Plaintiff had been given a draft performance improvement plan in June 2011, which was never implemented, see Pl.'s SOF ¶¶ 97-98, it is undisputed that Plaintiff's performance was unrelated to the elimination of her position. (Def.'s SOF ¶ 55; Pl.'s SOF ¶ 55).

### III.  Procedural History

Plaintiff filed an EEOC charge and an administrative complaint with the Pennsylvania Human Relations Commission on May 3, 2012.  (Ex. A to Compl., ECF 1).  The EEOC issued a right-to-sue letter on August 17, 2016.  (Ex. B. to Compl., ECF 1).

Thereafter, Plaintiff filed a Complaint in this Court on November 14, 2016.  (Compl., ECF 1).  Plaintiff twice amended her Complaint (ECF 6, 7).

On June 28, 2017, this Court granted Defendant's partial motion to dismiss the Second Amended Complaint.  (Mem. Granting Partial Mot. to Dismiss, ECF 11).  Defendant's motion sought dismissal of Counts III and IV, which alleged age discrimination under the Age Discrimination in Employment Act and the PHRA, and that the request for compensatory and punitive damages for ADA retaliation on Count V, be stricken.  (Id.)  The dismissal of Counts III and IV was entered without prejudice, but Plaintiff did not subsequently amend her Complaint.

On March 23, 2018, Defendant moved to file an amended answer.  (Mot. for Amended Answer, ECF 31).  Following a telephone conference, the Court granted the motion on March 26, 2018.  (Order, ECF 33).

The parties filed a stipulation on April 3, 2018 withdrawing Counts V and VI of the Second Amended Complaint, which alleged retaliation in violation of the ADA and the PHRA, respectively.  (Stipulation, ECF 38).

On April 23, 2018, Defendant moved for summary judgment on Counts I and II, the only counts remaining.  (Def.'s Mot. for Summ, J., ECF 41).  Plaintiff filed a response in opposition on May 7, 2018.  (Pl.'s Opp. to Mot. for Summ. J., ECF 44).  Defendant filed a reply on May 14, 2018.  (Def.'s Reply in Support of Mot. for Summ. J., ECF 47).

Oral argument was held on August 20, 2018.

## IV.    Legal Standard

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u>

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." <u>Id.</u> at 325. Summary judgment is appropriate if the non-moving party fails to rebut the motion by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." <u>Id.</u> Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson</u>, 477 U.S. at 255.

## V.    Discussion

Plaintiff alleges disability discrimination not on the grounds of any disability of her own, but on the basis of her husband's cancer. The Americans with Disabilities Act forbids "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Pennsylvania Human Rights Act likewise makes it unlawful to "exclude or otherwise deny equal jobs or benefits to a person

because of the handicap or disability of an individual with whom the person is known to have a relationship or association." 43 Pa. Cons. Stat. § 955(l).

Where plaintiffs proceed on indirect evidence of discrimination, as the parties agree is the case here, courts treat associational disability discrimination claims under the ADA and PHRA together under the <u>McDonnell Douglas</u> framework, <u>see</u> <u>Detwiler v. Clark Metal Prod. Co.</u>, No. CIV.A.08-1099, 2010 WL 1491325, at *24 (W.D. Pa. Mar. 19, 2010), <u>report and recommendation adopted,</u> No. CIV.A. 08-1099, 2010 WL 1489985 (W.D. Pa. Apr. 12, 2010) (citing <u>Gaul v. Lucent Technologies, Inc.,</u> 134 F.3d 576, 580 (3d Cir. 1998); <u>Rinehimer v. Cemcolift, Inc.,</u> 292 F.3d 375, 382 (3d Cir. 2002)).

Under the familiar <u>McDonnell Douglas</u> burden-shifting framework, a plaintiff must initially show by a preponderance of the evidence that a prima facie case of unlawful discrimination exists. <u>See</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). Second, once a plaintiff establishes a prima facie case, "the burden of production…shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision. <u>Smith v. City of Allentown</u>, 589 F.3d 684, 691 (3d Cir. 2009). Next, the burden of production shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013) (citing <u>Fuentes</u>, 32 F.3d at 764-65). Although the burden of production shifts throughout this process, the ultimate burden of persuading the trier of fact always remains with the plaintiff. <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

To state a prima facie case of employment discrimination on the basis of association with an individual with a disability, Plaintiff must show the following:

> (1) he was qualified at the time of the adverse employment action; (2) he was subject to an adverse employment action; (3) at the time of the adverse employment action, the plaintiff was known by his employer to have a relative or an associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the termination decision.

Tyson v. Access Servs., 158 F. Supp. 3d 309, 314 (E.D. Pa. 2016).

While the Third Circuit has yet to announce a firm test for claims of associational disability discrimination, it cited the Seventh Circuit's decision in Larimer v. Int'l Bus. Machines Corp., 370 F.3d 698, 700 (7th Cir. 2004), to suggest three circumstances in which a plaintiff "might prevail" on an associational disability discrimination claim:

> (1) termination based on a disabled relative's perceived health care costs to the company; (2) termination based on fear of an employee contracting or spreading a relative's disease; and (3) termination because an employee is somewhat distracted by a relative's disability, yet not so distracted that he requires accommodations to satisfactorily perform the functions of his job.

Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 n.7 (3d Cir. 2009) (affirming grant of summary judgment where the plaintiff alleged associational disability discrimination based on a need to take time off to care for her disabled daughter).

Plaintiff seeks to proceed under both the cost and distraction theories.

**A. Timeliness**

Before proceeding to the merits of Plaintiff's case, Defendant first argues that the filing of Plaintiff's administrative charges with the EEOC and the Pennsylvania Human Relations Council on May 3, 2012 makes Plaintiff's claims partially time-barred. Specifically, Defendant argues that any "alleged unlawful actions taken by the Hospital" more than 300 days prior to the filing of the EEOC charge and more than 180 prior to the PHRC charge. (Def.'s Mot. for Summ. J. (Def.'s Br.) at 3-4). Thus, according to Defendant, this Court should not consider instances of bias or improper conduct occurring prior to those time periods, leaving only Plaintiff's inclusion

in the reduction in force.  At oral argument, defense counsel explained that this argument was included in Defendant's brief to forestall any potential argument that the never-implemented performance improvement plan was itself an adverse employment action.

Defense counsel conceded at argument that it would proper for this Court to consider evidence of bias, such as comments, from before outside the 180- or 300-day period, and that no Third Circuit decision had held otherwise.  Indeed, the cases cited by Defendant stand only for the proposition that an ADA or PHRA suit would be time-barred if the charge were filed after the required period.  See, e.g., Aubrey v. City of Bethlehem, Fire Dep't, 466 F. App'x 88, 92 (3d Cir. 2012) (ADA suit was time-barred where EEOC claim was filed more than 300 days after the latest of several alleged discriminatory actions); Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (PHRA claims were time-barred where plaintiff resigned more than 180 before filing a charge with the PHRC).

Plaintiff was terminated on November 6, 2011.  She brought her EEOC and PHRC charges on May 3, 2012, which is less than 180 days later.  Her claims are under the PHRA and ADA are timely.

Plaintiff is not forbidden from adducing evidence from prior to the 180- or 300-day period to show that her termination on November 6, 2011 was discriminatory.  The Court therefore continues to the merits of Plaintiff's claims.

**B. Plaintiff's prima facie case**

**1. Health Care Costs**

Defendant asserts that it is entitled to summary judgment because there is no evidence that Burklow, who made the decision to terminate Plaintiff, knew whether Plaintiff and her family were "receiving health benefits through the Hospital" and what the impact of Plaintiff's

husband's medical care therefore was on the hospital's finances. (Def.'s Br. at 8). Under analogous cases from other jurisdictions, Defendant argues, summary judgment is warranted because Plaintiff lacks evidence of Defendant's perception of her husband's health care costs to the Hospital.

Plaintiff, who does not present any case law denying summary judgment on comparable facts, relies on two pieces of evidence to argue that summary judgment is improper: Burklow's statement a week before her termination about family illnesses being "impactful" immediately after a presentation about the hospital's finances, and Plaintiff's testimony that Burklow had stated, in late September 2011 immediately after her son's visit to the emergency department, that his daughter's treatment for brain cancer was costly. (Pl.'s Br. at 14).

While no published Third Circuit case has considered an associational disability discrimination claim proceeding under a cost theory, such cases, in other jurisdictions, have turned on the employer's knowledge of the health care costs to the company incurred by the relative of an employee. Thus, plaintiffs' claims fail where the decision-maker lacks knowledge of the health care costs to the employer, or where no evidence is presented regarding the employer's concern about the health care costs imposed by the relative of the employee.

Defendant relies on <u>Gaglioti v. Levin Grp., Inc.</u>, 508 F. App'x 476, 484 (6th Cir. 2012), in which the Sixth Circuit affirmed a grant of summary judgment where, even though the defendant employer "was seeking to cut costs," the plaintiff had not "put forth any evidence" that the two employees who decided to terminate the plaintiff "were concerned about the cost of [the plaintiff's wife's coverage." Defendant also cites two district court cases in which summary judgment was granted where the plaintiff had not produced evidence that the defendant employer was concerned about the health care costs incurred by the relative of the plaintiff. <u>See</u> <u>Cusick v.</u>

Yellowbook, Inc., 607 F. App'x 953, 955 (11th Cir. 2015) (summary judgment affirmed where the plaintiff presented no evidence that the decision-makers knew of the cost of his daughter's medical treatment or whether such costs were increasing [the defendant's] insurance premiums); Hopkins v. Sam's W., Inc., 216 F. Supp. 3d 1322, 1339 (N.D. Ala. 2016) (summary judgment granted where plaintiff had "come forward with no evidence that would give rise to" such an inference of discrimination based on the plaintiff's wife's health care costs, "such as evidence that his wife's medical costs were adversely affecting the Company's insurance rates or that the Company wanted to get his wife off its insurance plan"); White v. Carmeuse Lime & Stone, Inc., No. 2:09-CV-265, 2011 WL 3585064, at *9 (W.D. Mich. May 31, 2011) (summary judgment granted where plaintiff lacked evidence that the new owner of the company, in contrast to the former owner, "was concerned about, or even was keeping track of" the plaintiff's daughter's healthcare costs or that the decision-maker or company management "involved in [the plaintiff's] termination had general concerns about cost of healthcare" to the company).

By contrast, courts have reversed grants of summary judgment where a plaintiff has presented evidence that a corporation was concerned about the costs of an employee's relative's health care. For example, in Dewitt v. Proctor Hosp., 517 F.3d 944 (7th Cir. 2008), a case cited by both parties, the Seventh Circuit reversed a grant of summary judgment to the defendant— which, like Defendant in this case, was a hospital that was evidently in fiscal trouble and seeking to cut costs. The Seventh Circuit found that the plaintiff had shown direct evidence of discrimination—thus rendering the McDonnell Douglas framework inapplicable—where the plaintiff's supervisor, who fired her, asked twice in five months about the husband's course of treatment; in one such instance, the plaintiff's supervisor mentioned that the hospital was "reviewing [the plaintiff's husband's] unusually high medical expenses," and had informed the

hospital's clinical managers of the need to be "creative" in cutting costs. Dewitt, 517 F.3d at 948.[1]  Similarly, the Tenth Circuit found that two plaintiffs, who were terminated for alleged time fraud shortly after their son's cancer relapse, raised an inference of discriminatory motive sufficient to establish a prima facie case where the plaintiffs presented evidence of concerns by management "about rising healthcare costs, numerous efforts to cut those costs, corporate monitoring of general healthcare costs and of [the plaintiffs' son's] claims specifically." Trujillo v. PacifiCorp, 524 F.3d 1149, 1157 (10th Cir. 2008).

The two comments on which Plaintiff relies do not create a genuine issue of material fact. Plaintiff's testimony that Burklow stated that his daughter's brain cancer was costly, in context, unambiguously refers to the costs of treatment to him for his daughter's care, and does not bear on the costs of Plaintiff's husband's insurance or treatment to Defendant.  Similarly, it is a stretch to argue Plaintiff's recollection of Burklow's statement at the meeting about finances regarding family illnesses and deaths was evidence of Defendant's perception of Plaintiff's husband's costs to Defendant; Plaintiff's deposition testimony is unclear, and it is especially difficult to gauge what was "impactful," and how it pertained to the personal troubles Hospital management were experiencing.  There is no evidence, save Plaintiff's bare assertion, that this remark referred to the cost of employees' relatives health care to Defendant.

Viewing the facts in the light most favorable to Plaintiff, as is appropriate at the summary judgment stage, the Court finds that Plaintiff has failed to make out a prima facie case of associational disability discrimination.  There is no genuine issue of material fact regarding

---

[1] Defendant also argues, as a general matter, that Defendant's awareness of Plaintiff's husband's cancer months prior to Plaintiff's termination necessarily undercuts any inference of discrimination.  (Def.'s Br. at 7). However, none of the cases cited in this section of the brief was brought on a cost theory, and longstanding knowledge of a condition might, under certain circumstances, suggest concern about mounting health care costs to the defendant, as in Dewitt.

whether her husband's termination was, as the Third Circuit put it in <u>Erdman</u>, was "based on a disabled relative's perceived health care costs to the company." 582 F.3d at 511 n.7. As plaintiff's counsel conceded at oral argument, there is no evidence in the record showing whether or not Burklow even knew that Plaintiff and her family received their health insurance from Defendant, or whether her husband received care at the Hospital. Similarly, there is no evidence that the cost of Plaintiff's husband's treatment at the Hospital or the cost of Plaintiff's husband's medical care affected Burklow's decision to include Plaintiff in the eight-person layoff in November 2011. Ultimately, Plaintiff's case rests only on her assumptions about Burklow's omniscience regarding the hospital he ran—who was getting medical care there, which employees' dependents received health insurance through the Hospital—and her prima facie case accordingly fails.

### 2. Distraction

Plaintiff, who concedes that Burklow never said anything disparaging about her husband's cancer, cites three comments by Burklow to argue that her termination was because of her perceived distraction due to her husband's illness: (1) his comment to Dr. Robb at the meeting in December 2010 or January 2011 that Plaintiff was "distracted by [her] husband's illness"; (2) Plaintiff's testimony about how Burklow had told her in late September 2011 on the day after her son's emergency department visit about his daughter's struggle with cancer; (3) and his comment at the management meeting, approximately a week prior to her termination, that "some of us in leadership…had experienced either deaths in their family or serious illnesses in their families that were also…being impactful." (Pl.'s Dep. 255:24-256:4).

Only the first of these comments, uttered at least ten months before Plaintiff's dismissal, actually pertains directly to distraction from work duties. The Third Circuit has long held that

"[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) (single biased comment by a non-decisionmaker five years before a promotion decision could not support a gender discrimination claim); see also Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999) ("insensitive remarks" unrelated to the decisionmaking process "could not form the basis for a jury verdict").

Despite the greater temporal proximity of Burklow's remarks regarding Plaintiff's son and at the staff meeting, those remarks do not relate to Plaintiff's distraction. Plaintiff testified that Burklow stated, on the day after her son was seen in the emergency department, that managing a child with depression or mental health issues was "difficult and costly." (Pl. Dep. 100:16). Plaintiff actually states in her brief that Burklow's remark about the "impact" of family illnesses was "not free from ambiguity" and might have referred to cost, rather than distraction. (Pl.'s Br. at 13).

Plaintiff has adduced no evidence from which a reasonable jury could find that she was included in the reduction in force because of distraction stemming from her husband's illness. To the contrary, the evidence indicates that Defendant was under fiscal pressure, and Plaintiff's position was eliminated solely because the physician practices, which Plaintiff oversaw, were losing money. Burklow's frequent questioning about Plaintiff's husband's health may have been inappropriate and intrusive, and her termination may have come at a difficult moment in her life. However, she has not shown a genuine issue of material fact as to whether her termination as part of the reduction in force was due to her distraction from her husband's illness, and she has failed to make out a prima facie case on a distraction theory.

### C. The Hospital's Reason for Plaintiff's Termination

At the second stage of the <u>McDonnell Douglas</u> inquiry, after a plaintiff makes a prima facie case—and the Court will assume, for a moment, that she has—the burden shifts to the employer to "articulate a legitimate nondiscriminatory rationale for [her] layoff." <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006).

The Hospital asserts that Plaintiff was terminated in the November 2011 reduction in force to cut costs because the physician practices were losing money.

### D. Pretext

Finally, Plaintiff must show pretext. Even if Plaintiff had been able to make out a prima facie case, her claims would fail at the pretext stage. At the final stage of the McDonnell Douglas framework, a plaintiff "must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003). To defeat a defendant's summary judgment motion and establish a genuine issue of material fact regarding pretext, the Third Circuit "require[s] plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005). A plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." <u>Keller v. Orix Credit All., Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994)).[2]

Plaintiff's assertions of pretext do not meet this standard. When asked at oral argument what her best evidence was of pretext, her counsel simply repeated all of the arguments regarding Burklow's alleged bias she had pointed to in her prima facie case. Even if she had been able to make out a prima facie case, this evidence is insufficient to raise an inference of pretext. Counsel also alluded to evidence that Burklow was concerned over other employees' use of FMLA leave. While "[a] plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing … that the employer has discriminated against other members of his protected class or other protected categories of persons," <u>Ansell v. Green Acres Contracting Co.</u>, 347 F.3d 515, 521 (3d Cir. 2003), the record shows that Burklow was concerned about the expense of taking time off for FMLA, which Plaintiff did not do. (Pl.'s Dep. 272:14-273:10; Burklow Dep. 100:8-106:6). There is no record evidence that Burklow expressed his concern about another employee's self-reported timekeeping to "make a point" to Plaintiff, as Plaintiff asserts in her brief.

Second, as supposed evidence of Burklow's "mendacity," Plaintiff cites several disputes of fact, none of which has any direct bearing on the core issue of why she was terminated or included in the reduction in force. Plaintiffs may indeed show pretext by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

---

[2] Plaintiffs counsel, at oral argument, asserted that his best case was <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074 (3d Cir. 1996), a Title VII race discrimination case brought on hostile work environment, constructive discharge, and retaliation theories. Plaintiff urges this Court to consider the evidence in its totality—which, as <u>Aman</u> put it in its discussion of hostile work environment, may weave together to form a "complex tapestry of discrimination." <u>Id.</u> at 1083. The discussion in <u>Aman</u> pertained only to the hostile work environment analysis and did not refer to how to evaluate pretext at the final stage of the <u>McDonnell Douglas</u> inquiry.

the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (alteration original) (reversing grant of summary judgment where the plaintiff presented evidence to discredit the employer's rationales for his inclusion in a reduction in force).[3]

In this case, however, the purported inconsistencies and factual disputes do not bear directly on Defendant's reasons for Plaintiff's termination; rather, Defendant has been entirely consistent that Plaintiff was terminated to cut costs related to the physician practices, which were losing money. For example, Plaintiff relies on a factual dispute about which employee was the subject of the "country club" comment and about the existence (or not) of a committee that replaced Plaintiff's duties after Plaintiff's departure. (Pl.'s Br. at 21). At best, Plaintiff, through the declaration from Susan Lesch attesting that her parents had not died, has shown a discrepancy in the inspiration for Burklow's statement at the management meeting in October. This is not sufficient evidence from which a jury could reasonably disbelieve that Plaintiff was

---

[3] At oral argument, defense counsel identified Mengel v. Reading Eagle Co., No. CIV.A. 11-6151, 2013 WL 1285477 (E.D. Pa. Mar. 29, 2013), as one of his best cases. In its brief, Defendant quotes dicta to the effect that "in order to show pretext [a plaintiff] would essentially need show that the entire reduction in force was a hastily-designed cover-up to retaliate against her," for which Mengel cited no precedent. Id. at *7. In Mengel, the plaintiff, who had been included in a reduction in force purportedly on the basis of low evaluation scores, alleged gender discrimination; disability discrimination on the basis of her hearing impairment and balance issues; and retaliation for complaining about having been called a "tar baby." Id. The district court made the above statement in its discussion of whether her dismissal had been retaliatory. Because this statement from Mengel could be interpreted to allow defendants to escape liability by dismissing employees for discriminatory reasons by including them in otherwise legally valid reductions in force, the Court does not endorse it in this case, where Plaintiff does not proceed on a retaliation theory, and has not shown any evidence that her inclusion in the reduction in force was discriminatory. Moreover, as Plaintiff points out, other cases involving reductions in force, such as Herman v. Kvaerner of Philadelphia Shipyard, Inc., 461 F. Supp. 2d 332, 337 (E.D. Pa. 2006), have evaluated whether a genuine issue of material fact existed as to whether the plaintiff's inclusion in the reduction in force was discriminatory, rather than whether the entire reduction in force was retaliatory.

terminated to cut costs from the physician practices or believe that she was terminated instead on the basis of the costs to the hospital of, or her distraction from, her husband's cancer. <u>See</u> <u>Fuentes</u>, 32 F.3d at 764.

Third, Plaintiff asserts that pretext is established by the lack of "objective criteria" for the reduction in force, which included seven other individuals, none of whose inclusion she has asserted to be discriminatory. This does not rebut the "core facts" of Defendant's reasons for her termination. <u>See</u> <u>Kautz</u>, 412 F.3d at 467.

Finally, she argues that her dismissal was pretextual because she was "set up to fail," but provides no record support for this assertion. It is undisputed that the performance improvement plan she was given in June 2011 was never implemented.

Thus, Plaintiff's claims of associational disability discrimination fail because she cannot show that her termination was pretextual.

## VI. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED**. An appropriate order follows.

O:\CIVIL 16\16-5857 Dodson v. Coatesville Hospital\16cv5857 MSJ Memo.docx